Don Springmeyer, Esq. (SBN# 1021)
Michael J. Gayan, Esq. (SBN#11135)
Alysa M. Grimes, Esq. (SBN#15415)
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Tel.: (702) 385-6000
Fax: (702) 385-6001
Email: d.springmeyer@kempjones.com

Robert A. Izard *(pro hac vice forthcoming)*
rizard@ikrlaw.com
Douglas P. Needham *(pro hac vice forthcoming)*
dneedham@ikrlaw.com
Oren Faircloth *(pro hac vice forthcoming)*
ofaircloth@ikrlaw.com
IZARD KINDALL & RAABE
29 South Main Street, Suite 305
West Hartford, Connecticut 06107
Tel: (860) 493-6292
Fax: (860) 493-6290

Gregory Y. Porter *(pro hac vice forthcoming)*
gporter@baileyglasser.com
Mark G. Boyko *(pro hac vice forthcoming)*
mboyko@baileyglasser.com
BAILEY & GLASSER LLP
1054 31st Street, NW, Suite 230
Washington, DC 20007
Tel.  (202) 463-2101
Fax: (202) 463-2103
*Attorneys for Plaintiff, Marsha R. DuVaney and
the putative class*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Marsha R. DuVaney, on behalf of herself and all others similarly situated, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| Delta Airlines, Inc., the Administrative Committee of Delta Airlines, Inc., Greg | |

Tahvonen, Mindy Davison, Janet Brunk and
John/Jane Does 1–5,

                        Defendants.

## COMPLAINT

Plaintiff Marsha R. DuVaney, by and through her attorneys, on behalf of herself and all others similarly situated, based on personal knowledge with respect to her own circumstances and based upon information and belief pursuant to the investigation of her counsel as to all other allegations, alleges the following.

## INTRODUCTION

1.      This is a class action against Defendant Delta Air Lines, Inc. ("Delta"), the Administrative Committee of Delta Airlines, Inc. (the "Administrative Committee"), Greg Tahvonen, Mindy Davis and Janet Brunk, the individual members of the Committee concerning the failure to pay joint and survivor annuity ("JSA") benefits under the Northwest Airlines Pension Plan for Contract Employees (the "Contract Plan"), the Northwest Airlines Pension Plan for Salaried Employees (the "Salaried Plan"), and the Northwest Airlines Pension Plan for Pilot Employees (the "Pilots Plan") (together "the Plans") in amounts that meet the requirements of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA") with respect to actuarial equivalence. Defendants' violation of ERISA's actuarial equivalence requirements causes retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      Delta sponsors the Plans. Under the Plans, a participant earns retirement benefits in the form of a single life annuity ("SLA"), which is a single annuity that pays monthly benefits for the rest of the participant's life, with payments to a beneficiary annuitant after the participant's death.

3.      The Plans offer participants the option of receiving their benefits in forms other than an SLA, including several JSAs.  JSAs are an annuity for the life of the participant with a contingent annuity for the life of the participant's spouse.  A JSA may provide different payment amounts to the spouse than the monthly benefit that is paid during the joint lives of the participant and the spouse, typically expressed as a percentage.  Thus, a JSA that pays the spouse half of the amount that was paid before the participant's death is referred to as a 50% JSA; one that pays the spouse three quarters of the amount paid prior to the participant's death is a 75% JSA.

4.     The monthly benefit payable as a JSA, regardless of the percentage, is less than the amount payable as an SLA, to account for the likelihood that the plan will have pay benefits for a longer period if a participant dies before the spouse.  However, ERISA limits the amount that JSA benefits can be reduced.  JSA benefits that pay between 50% to 100% of the amount paid during the joint lives of the participant and spouse ("Qualified Joint and Survivor Annuities" or "QJSAs") must be at least the actuarial equivalent of the SLA (or, if the plan subsidizes a different benefit form, at least the actuarial equivalent of that more valuable benefit).  Two benefit options are actuarially equivalent when they have the same present value, so long as the present values of each benefit is calculated using the same, reasonable actuarial assumptions.

5.     Calculating the present value of the future payments requires assumptions concerning mortality rates for the participant (and, in the case of a JSA, the participant's spouse) in order to estimate the likelihood of each future benefit payment being made, as well as an interest rate assumption to discount the value of expected future payments to the present.  The interest rate assumption addresses the time value of money — the idea that a dollar in the hand today is worth more than a dollar paid in a year, or in ten years.

6.     Mortality assumptions for participants and beneficiaries and interest rate assumptions *together* generate a "conversion factor," which expresses the dollar amount of one monthly benefit as a fraction of the dollar amount of the monthly benefit paid in the form of the comparator benefit.  If a plan's "conversion factor" for QJSA benefits, relative to either the SLA benefit or a more valuable plan benefit, is lower than the conversion factor that would be generated from reasonable actuarial assumptions about mortality and interest rates, then the plan's QJSA benefits are not "actuarially equivalent."

7.     The Plans' "conversion factors" for calculating JSA benefits are lower than the conversion factors generated by reasonable actuarial assumptions, resulting in the payment of JSA benefits that are not actuarially equivalent to the SLA benefits participants could elect to take instead.  Under the Plans, Defendants use a .90 conversion factor to calculate a 50% joint and survivor annuity and a .80 conversion factor to calculate a 100% joint and survivor annuity. These conversion factors do not provide participants with actuarially equivalent benefits.  For a 65-year-

old participant with a 65-year-old spouse, the conversion factor for the 50% JSA in 2020, based on reasonable actuarial assumptions, would have been .92, or 2.3% higher than what the Plans pay. The conversion factor for the 100% JSA would have been .85, or 6.6% more than the Plans pay.

8. The Plans' conversion factors thus depress the present value of benefits received as a JSA, resulting in benefits that are materially **lower** than the actuarial equivalent of the Plans' SLA benefits. In sum, Delta is causing Plaintiff and Class Members to receive less than they should as a pension each month, which will continue to affect them throughout their retirements.

9. Accordingly, Plaintiff brings this action on behalf of herself and the proposed Class, seeking, *inter alia*, an Order from the Court reforming the Plans to conform to ERISA, payment of future benefits in accordance with the reformed Plans, as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines is just and equitable.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

11. This Court has personal jurisdiction over Delta because it is the district where Delta transacts business in, or has significant contacts with, and may be found in this District, and because ERISA provides for nationwide service of process.

12. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Delta may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Delta does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

**Plaintiff**

13.    Plaintiff Marsha R. DeVaney is a resident of Henderson, Nevada, and a participant in the Contract Plan.  Mrs. DeVaney worked as a flight attendant for Northwest for approximately 33 years and began collecting benefits on January 31, 2020. She currently receives a 50% joint and survivor annuity, with her husband as the beneficiary.

**Defendants**

14.    Delta is a global air carrier incorporated in Delaware with its headquarters in Atlanta, Georgia.  Delta, along with its subsidiaries and affiliates, operates over 5,000 flights daily and serves an extensive domestic and international network with over 300 destinations on 6 continents. Delta is the sponsor of the Plans under 29 U.S.C. § 1002(16)(B) and a named fiduciary under 29 U.S.C. § 1002(A)(2).

15.    The Administrative Committee of Delta Air Lines, Inc. is the administrator of the Plans under 29 U.S.C. § 1002(16)(A), a named fiduciary under 29 U.S.C. § 1002(A)(2), and a fiduciary for the Plans, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or control respecting the management or disposition of assets of the Plans. The Administrative Committee is comprised of at least three members who are appointed by the Executive VP – Human Resources of Delta.

16.    Defendant Greg Tahvonen is Delta's V.P. of Total Rewards and Global Human Resources.  Upon information and belief, he is an individual residing in Georgia and currently is the Chair of the Committee.

17.    Defendant Mindy Davison is Delta's Director of International Human Resources. Upon information and belief, she is an individual residing in Georgia and currently is a member of the Committee.

18.    Defendant Janet Brunk is Delta's General Manager of Benefit Plans.  Upon information and belief, she is an individual residing in Georgia and currently is a member of the Committee.

4

19.     John/Jane Does 1 through 5, inclusive, are the other individual members of the Administrative Committee responsible for administering the Plans throughout the relevant time period.  Their names and identities are not currently known.

### **APPLICABLE ERISA REQUIREMENTS**

### *Pension Benefit Options Must Be Actuarially Equivalent*

20.     ERISA requires that benefits paid to Participants who do not die before beginning to receive benefits be in the form of a QJSA unless the Participant elects to waive the QJSA and affirmatively selects a different benefit form. 29 U.S.C. § 1055(a)(1) and (c)(1)(A)(i). A plan can offer multiple QJSA options; that is, JSAs that pay survivor benefits between 50% to 100%.  29 U.S.C. § 1055(d)(1).  The plan must designate one QJSA as the default option for married participants; the default QJSA can be more valuable than the other offered QJSA forms, but does not have to be.  26 C.F.R. § 1.401(a)-20, Q&A 16.

21.     ERISA requires that QJSA benefits be at least the actuarial equivalent of the SLA (29 U.S.C. § 1055(d)(1)).  If the plan offers benefit options that are more valuable than the SLA, QJSAs must also be no less valuable than the most valuable form of benefit. *See*; 26 U.S.C. § 417(b).

22.     ERISA requires that plans offer at least two JSA benefits that meet the requirements of § 205(d)(1) by having survivor annuities of between 50% and 100%, although it may have more.   If the default QJSA under the plan has a survivor annuity of less than 75%, the plan must offer a 75% JSA as an option, whereas if the default QJSA has a survivor annuity that is greater than or equal to 75%, then the plan must offer a 50% JSA as an option.  These mandatory options are called "Qualified Optional Survivor Annuities," or "QOSAs."  ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); *see also* 26 U.S.C. § 417(g). QOSA are covered by ERISA's actuarial equivalence requirements, just like any other QJSA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii), 26 U.S.C. § 417(g).

23.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA"). *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity for the life of the participant's surviving spouse (*i.e.,* a beneficiary) if the participant dies

before starting to receive benefits. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must not be less than the amount that would have been payable to the surviving spouse under the plan's designated default QJSA for married participants. ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

24.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205 concerning alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

25.     The Treasury regulations for the Tax Code provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16.

26.     ERISA does not require that pension plans offer lump-sum distributions of vested benefits to retirees upon their retirement. *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans offer a lump-sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires the present value of the lump sum be determined using the applicable mortality table (the "Treasury Mortality Table")[1] and applicable interest rate (the "Treasury Interest Rate")[2] (collectively, the "Treasury Assumptions"), which are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

27.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.  ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if an employee's accrued benefit is in the form other than an SLA, the accrued benefit "shall be the actuarial equivalent" of an SLA.

---

[1] *See* 26 C.F.R. § 1.430(h)(2)-1.
[2] *See* 26 C.F.R. § 1.430(h)(3)-1.

28.    The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

### *Reasonable Factors Must be Used When Calculating Actuarial Equivalence*

29.    "Two modes of payment are actuarially equivalent when their ***present values*** are ***equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1 - 24-91 (1991) ("Schwartzmann & Garfield").[3]

30.    Under ERISA, "present value" must "reflect anticipated events." Such adjustments must conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27).  Applicable Treasury Regulations require that actuarial present value be determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

31.    The Regulations rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. See, e.g., 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

32.    Like the Regulations and ERISA's definition of "present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board ("ASB")[4] of the American Academy of Actuaries (the "Academy"), require actuaries to use "reasonable assumptions." See ASOP No. 27, Para. 3.6 ("each economic assumption used by an actuary

---

[3]  According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent.    "Equal"    means    the    "same."    https://www.merriam webster.com/dictionary/equal

[4]  The ASB, an independent entity created by the Academy in 1988, serves as the single board promulgating standards of practice for the entire actuarial profession in the United States. The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

should be reasonable"). See also ASOP No. 35, Para. 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

33.    Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd*, 719 Fed. Appx. 540 (8th Cir. 2018). As the court explained in *Dooley v. Am. Airlines, Inc.*, each actuarial assumption used to calculate QJSAs, QOSAs, and QPSAs must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity. The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at *10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

34.    Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor the participants should be better or worse off if a participant selects an SLA or a JSA. *See Bird v. Eastman Kodak Co.*, 390 F. Supp. 2d 1117, 1118–19 (M.D. Fla. 2005). "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment." Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-C-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

/ / /

/ / /

# SUBSTANTIVE ALLEGATIONS

I.      The Plans

　　　　A.　　**The Contract Plan**

35.    The Contract Plan was first established by Northwest on January 1, 1970 "for the benefit of eligible union-represented employees." Contract Plan Statement, § 1.1.   It provides pension benefits to employees of Northwest before October 1, 2006, that were represented by a union in the collective bargaining process.[5]

36.    All participants in the Contract Plan are former employees of Northwest, spouses of former employees, or other beneficiaries.

37.    The Contract Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A) and a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

38.    The Contract Plan is administered by the Administrative Committee. Contract Plan Statement, § 7.1.

39.    Under the Contract Plans, participants earn a pension in the form of a SLA that begins at age 65. *Id.*, §§ 3.1.1 and 1.2.18. Participants' monthly pensions are based on an accrual rate (position dependent) multiplied by the years of benefit accrual service, offset by amounts received for certain other plans. *Id.*, §§ 1.2.2 and 1.2.7.

40.    The Contract Plan provides that the normal form of retirement benefit for unmarried participants is an SLA. Contract Plan Statement, § 4.2. For married participants, the normal form of benefit a 50% joint and survivor annuity. *Id.*

41.    The Contract Plan also provides Participants other QJSA benefit forms — a 75% JSA (the QOSA) and a 100% JSA.  *Id.*, § 4.1.3 ("Survivor Benefit").

---

[5] These employees were represented by the Association of Flight Attendants ("AFA"), the Aircraft Mechanics Fraternal Association ("AMFA"), the Aircraft Technical Support Association ("ATSA"), the International Association of Machinists and Aerospace Workers ("IAM"), the Northwest Airlines Meteorologists Association ("NAMA"), the Northwest Airlines Foremen's Association ("NAFA"), and the Transport Workers Union of America ("TWUA").

42.     The Contract Plan further provides that the "value of the amounts payable to the Participant and spouse in the Qualified Joint and Survivor Benefit form shall be the Actuarial Equivalent of the amounts payable . . . in the Single Life Benefit form. . . . ."  *Id.*, § 1.2.24 (definition of "Qualified Joint and Survivor Benefit").

43.     Appendix C of the Contract Plan Statement is titled "Determination of Actuarial Equivalent to Single Life Benefit," and sets forth how a participant's benefit is converted from the form it is accrued, an SLA, to other forms, including the 50%, 75% and 100% JSAs.  Section 2 of Appendix C provides:

The monthly amount of retirement benefit payable to a Participant in the optional forms of pension available to the Participant is as follows:

| (a) | Qualified Joint & Survivor Benefit form (50%) and Survivor Benefit form (50%) | 90% of the Single Life Benefit form monthly benefit +0.5% for each year the joint annuitant is older than the Participant and −1.0% for each year the joint annuitant is younger than the Participant |
|---|---|---|
| (b) | Survivor Benefit form (75%) | 85.0% of the Single Life Benefit form monthly benefit +0.5% for each year the joint annuitant is older than the Participant and -1.0% for each year the joint annuitant is younger than the Participant |
| (c) | Survivor Benefit form (100%) | 80% of the Single Life Benefit form monthly benefit +0.5% for each year the joint annuitant is older than the Participant and -1.0% for each year the joint annuitant is younger than the Participant |

44.     If a married participant dies before they begin receiving their pension benefits, the surviving spouse receives the monthly amount that he or she would have received if the Participant terminated employment on the date of death and elected to receive the default 50% QJSA.  *Id.* at § 5.1.2.

### B.     The Salaried Plan

45.     The Salaried Plan provides pension, benefits to employees of Northwest that were classified as "salaried" employees before September 1, 2006.

46.     All participants in the Salaried Plan are former employees of Northwest, spouses of former employees, or other beneficiaries.

47.     The Salaried Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A) and a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

48.     The Salaried Plan is administered by the Administrative Committee.

49.     Participants of the Salaried Plan earn pension benefits in the form of a SLA under a final average earnings ("FAE") formula or a cash balance formula.

50.     Participants can receive their pension benefits as an SLA or as a joint and survivor annuity (50%, 75%, or 100%).

51.     The Salaried Plan calculates the benefit amounts for participants receiving JSAs using the following conversion factors:

| Qualified Joint & Survivor and Survivor Annuity form (50%) | 90.5% of the Single Life Annuity form monthly benefit +0.5% for each year the Joint Annuitant is older than the Participant and -0.5% for each year the Joint Annuitant is younger than the Participant. |
| Survivor Annuity form (75%) | 85.5% of the Single Life Annuity form monthly benefit +0.5% for each year the Joint Annuitant is older than the Participant and -0.5% for each year the Joint Annuitant is younger than the Participant. |
| Survivor Annuity form (100%) | 80.5% of the Single Life Annuity form monthly benefit +0.5% for each year the Joint Annuitant is older than the Participant and -0.5% for each year the Joint Annuitant is younger than the Participant. |

*See* Salaried Plan, Form 5500 (2012) - Schedule SB.

**C.     The Pilots' Plan**

52.     The Pilots' Plan provides pension benefits to pilots who worked for Northwest before February 1, 2006.

53.     All participants in the Pilots' Plan are former employees of Northwest, spouses of former employees, or other beneficiaries.

54.     The Pilots' Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A) and a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

55. The Pilots' Plan is administered by Delta and the Administrative Committee.

56. Participants earn pension benefits in the form of a SLA beginning at age 60.

57. The normal form of benefits for unmarried Participants is an SLA and is a 50% qualified joint and survivor annuity for married participants.

58. The Pilots Plan also offers elect a 75% and a 100% JSA.

59. The Pilots Plan calculates the 50%, 75% and 100% JSAs using the following conversion factors:

| Qualified Joint & Survivor | 100% of the Single Life Annuity form monthly benefit -0.5% for each year the Joint Annuitant is younger than the Participant. |
|---|---|
| Survivor Annuity form (50%) | 90.5% of the Single Life Annuity form monthly benefit +0.5% for each year the Joint Annuitant is older than the Participant and -0.5% for each year the Joint Annuitant is younger than the Participant. |
| Survivor Annuity form (75%) | 85.5% of the Single Life Annuity form monthly benefit +0.5% for each year the Joint Annuitant is older than the Participant and -0.5% for each year the Joint Annuitant is younger than the Participant. |
| Survivor Annuity form (100%) | 80.5% of the Single Life Annuity form monthly benefit +0.5% for each year the Joint Annuitant is older than the Participant and -0.5% for each year the Joint Annuitant is younger than the Participant. |

## II. The Plan's QJSAs, QOSAs, and QPSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements

### A. Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable As of the Date Benefits Are Calculated

60. As discussed above, to compare the value of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the present value of the *aggregate* (*i.e.*, total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive under both forms using actuarial assumptions that are reasonable as of that date.

61. An interest rate is used to determine the present value of each future payment. This is based on the time value of money, meaning that money available now is worth more than

the same amount in the future due to the ability to earn investment returns.  The rate is often called a "discount rate" because it discounts the value of a future payment.

62.     The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term, and long-term expectations pertaining to each future payment. *See, e.g.*, 29 U.S.C. §§ 1055(g)(3)(B)(iii), 1083(h)(2).

63.     Pursuant to Actuarial Standard of Practice No. 27 ("ASOP 27"), para. 3.6 of the Actuarial Standards Board,[6] "each economic assumption used by an actuary should be reasonable."[7]  An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate of future experience."  *Id*. (emphasis in original).  The Treasury Interest rates are reasonable because they reflect current economic conditions.

64.     A mortality table is a series of rates that predict how many people at a given age will die before attaining the next higher age.

65.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries ("SOA"), an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM") 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014") and 2019 (the "Pri-2012") to account for changes to a population's mortality experience.

---

[6] Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens*, 644 F.3d at 440 (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[7] Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/ (last accessed on June 25, 2019).

66.    Since at least the 1980s, the life expectancies in mortality tables have steadily improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014) at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the RP-2000 mortality table to the RP-2014 table would increase pension liabilities by 7%.

67.    Pursuant to Actuarial Standard of Practice No. 35, para. 3.5.3 of the Actuarial Standards Board,[8] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[9]

68.    Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality. For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected

---

[8] Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Schwartzmann & Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[9] Available at: http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

14

improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[10] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[11]

69.     For purposes of determining whether two benefits are "actuarially equivalent" under ERISA, the mortality assumptions used to calculate present value must be reasonable, which means that the selected mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C. § 1002 (27). The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

70.     If the present value of an SLA and a JSA are equal when those present values are calculated using the same reasonable interest rate and mortality assumptions, the two benefits are actuarially equivalent.

> ### B.     The Plans' Tabular Factors for Calculating JSA Benefits Do Not Provide Actuarial Equivalent Benefits.

71.     The Plans' conversion factors do ***not*** produce QJSAs, QOSAs or QPSA benefits that satisfy ERISA's actuarial equivalence requirements.

72.     The Plans do not identify the actuarial assumptions upon which the conversion factors set out in the Plans' tables to calculate the 50%, 75%, or 100% JSAs are based. It is likely that the Plans' conversion factors were set decades ago, when mortality rates were significantly higher, and were never updated.  The Contract Plan's conversion factors, for example, have not changed since 1996. Regardless of the reason, however, the conversion factors shown in the tables are unreasonably low compared to the conversion factors generated by using actuarial assumptions that were reasonable at any time during the last decade.

---

[10] Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf
[11] Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf

73.    The chart below illustrates the conversion factors and the benefits for a 65-year-old with a 65-year-old spouse who earned an SLA of $1,000 per month over most of the relevant time period, using the Contract Plan's tabular factors and the applicable Treasury Factors.

**65-Year-Old at Benefit Commencement Date**

| Year | Benefit Form | The Plans' Conversion Factors | Monthly Amount Using the Contract Plan's Conversion Factors | Conversion Factors Using Treasury Assumptions | Monthly Amount Using the Treasury Conversion Factors | Percent Difference in Benefit Amount |
|------|-------------|-------------------------------|-----------------------------------------------------------|----------------------------------------------|-----------------------------------------------------|--------------------------------------|
| 2020 | SLA | N/A | $1,000.00 | N/A | $1,000.00 | N/A |
|      | 50% JSA | 0.9 | $900 | 0.9205 | $921 | **2.33%** |
|      | 100% JSA | 0.8 | $800 | 0.8528 | $853 | **6.63%** |
| 2019 | SLA | N/A | $1,000 | N/A | $1,000 | N/A |
|      | 50% JSA | 0.9 | $900 | 0.9258 | $926 | **2.89%** |
|      | 100% JSA | 0.8 | $800 | 0.8618 | $862 | **7.75%** |
| 2018 | SLA | N/A | $1,000 | N/A | $1,000 | N/A |
|      | 50% JSA | 0.9 | $900 | 0.9257 | $926 | **2.89%** |
|      | 100% JSA | 0.8 | $800 | 0.8616 | $862 | **7.75%** |

74.    As demonstrated above, the conversion factors Defendants use for the Plans in each year during the Class Period, result in Class Members receiving ***substantially lower*** (*i.e.,*

16

worse for participants) benefits than compared to conversion factors generated using the Treasury Assumptions.

75.    Defendants' application of these unreasonably low conversion factors to calculate participants' JSAs results in benefits that do not satisfy ERISA's actuarial equivalence requirement and in lower monthly payments than participants should receive.

76.    While the amount of the loss suffered will vary depending on the ages of the participant and beneficiary at the time of retirement, all participants receiving JSAs under the Plans are not receiving actuarially equivalent benefits because the present values are not equal to that of the SLA they could have taken when they began receiving benefits.

77.    Plaintiff Marsha DeVaney began collecting benefits under the Contract Plan on January 31, 2020. She accrued, and was offered, an SLA that would have paid her $2,164.56 per month. She selected the 50% JSA, which $1,851.52 per month. If the 2020 Treasury Assumptions were used to calculate her benefits instead of the Contract Plan's fixed conversion factors, Plaintiff's benefit would be $1,927.67 or $66.15 more per month. By using these artificially low conversion factors instead of reasonable, current actuarial assumptions like the applicable Treasury Assumptions, Defendants reduced the present value of Plaintiff's benefits when she retired by $12,605.

78.    Plaintiff has been harmed because her benefits are not actuarially equivalent to the SLA she could have taken. She is receiving less each month than she would have received if the Defendants used conversion factors based on current, reasonable actuarial assumptions. Plaintiff, along with other participants and beneficiaries of the Plans, has been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

79.    Delta knows the importance of updating actuarial assumptions, and uses up-to-date actuarial assumptions when calculating pension costs in its audited financial statements that it prepared with the assistance of an independent auditor throughout the relevant time period. Under Generally Accepted Accounting Principles ("GAAP"), mortality assumptions "should

17

represent the 'best estimate' for that assumption as of the current measurement date."[12] In its Annual Report for the year ending December 31, 2014, Delta stated that it was updating the mortality table used to measure its pension *obligations* to the SOA's most recent table but did update the table it used to calculate pension benefits under the Plans. Delta's 10-K filed on February 11, 2015 states:

> On October 27, 2014, the SOA published updated mortality tables for U.S. plans and an updated improvement scale, which both reflect improved longevity. Based on an evaluation of these new tables and our perspective of future longevity, ***we updated the mortality assumptions for purposes of measuring pension and other postretirement and postemployment benefit obligations*** on December 31, 2014. The improvement in life expectancy increases our benefit obligations and future expense as benefit payments are paid over an extended period of time.[13]

80.    In its Form 10-K for the year ending December 31, 2015, Delta acknowledged it "reviewed the mortality assumptions and concluded that the assumptions used in 2014 continue to represent our best estimate of long-term life expectancy. We will continue to review our assumptions on an annual basis."[14] In fact, in each of Delta's Form 10-Ks for the last 5 years,

---

[12] As noted in a "Financial Reporting Alert" by Deloitte:

> Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3.

[13] *See* Delta's 10-k for year ending December 31, 2014 at 42, available at: https://ir.delta.com/financials/default.aspx.

[14] *See* Delta's 10-k for year ending December 31, 2015 at 43, available at:

Delta has reaffirmed its commitment to reviewing any SOA updates in setting mortality assumptions.[15]   Indeed, when calculating pension obligations, Delta consistently chooses, as its "best estimate" of participant mortality, a mortality assumption that comports with the SOA's most recent update.

81.    Throughout the Class Period, Delta reviewed the "most critical assumptions impacting [its] defined benefit pension plan *obligations*[,]" using reasonable and up-to-date actuarial assumptions but neglected to update the actuarial assumptions used to calculate the conversion factors for determining benefits under the Plans. There is no reasonable justification for Defendants not to use equally up-to-date assumptions to calculate conversion factors that would generate actuarially equivalent JSA benefits.

82.    "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, '[i]f plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000). Although Defendants consistently used reasonable mortality assumptions in calculating pension benefit obligations, Defendants failed to update the conversion factors it used to calculate JSA benefits to reflect its own "best estimates" of mortality and interest rates for its plan population.

83.    During the relevant period, Defendants' use of low fixed factors to calculate JSAs under the Plans was unreasonable. Had the Plans' fixed factors been based on up-to-date actuarial

https://ir.delta.com/financials/default.aspx

[15] *See id.*; *see also* Delta's 10-k for year ending December 31, 2016 at 45 ("Each year we consider updates by the SOA in setting our mortality assumptions for purposes of measuring pension and other postretirement and postemployment benefit obligations").; Delta's 10-k for year ending December 31, 2017 at 43 (same);  Delta's 10-k for year ending December 31, 2018 at 46 (same); Delta's 10-k for year ending December 31, 2019 at 44 (same);  Delta's 10-k for year ending December 31, 2020 at 50 (same). All annual reports available at: https://ir.delta.com/financials/default.aspx

assumptions, Plaintiff and the Class would have received, and would continue to receive, pension benefits that are greater than the benefits currently received.

84.    The differences in benefit amount between the conversion factors produced using Delta's assumptions for calculating pension liabilities and the conversion factors the Plans use will vary depending on the applicable Plan and the ages of the participant and the beneficiary. However, participants and beneficiaries who receive JSAs under the Plans are not receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA that they could have received.

85.    Discovery will likely show that Defendants' use of unreasonable conversion factors deprived retirees and their spouses of millions of dollars.

86.    Because the Plans used unreasonable conversion factors throughout the relevant time period, the benefits paid to participants and beneficiaries who receive QJSAs, QOSAs, and QPSAs are *not* actuarially equivalent, in violation of ERISA § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A). Rather, the benefits payable under these forms of benefit are much lower than they should be.

## CLASS ACTION ALLEGATIONS

87.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the class (the "Class") defined as follows:

> All participants and beneficiaries of the Plans receiving a JSA with a survivor benefit of at least 50%, and no more than 100%, of the benefit paid during the participant's life, where the first benefit payment to the participant was paid on or after December 10, 2015, and all persons who are receiving QPSA benefits whose first benefit payment was received on or after December 10, 2015. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plans.

88.    The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of persons. For example, the Contract Plan alone has over 22,000 participants that currently receive benefits and Delta estimates that 25% of participants select a JSA when retire.

20

89.     Plaintiff's claims are typical of the claims of the members of the Class because her claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

90.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      A.  Whether the Plans provide QJSAs, QOSAs, and QPSAs that meet ERISA's actuarial equivalence requirements;

      B.  Whether the Plans' conversion factors are reasonable;

      C.  Whether the Plans should be reformed to comply with ERISA; and

      D.  Whether Plaintiff and Class members should receive additional benefits.

91.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

92.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

93.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

94.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### FIRST CLAIM FOR RELIEF

### Declaratory and Equitable Relief

### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

95.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

96.     The Plans improperly reduce annuity benefits for participants and beneficiaries who receive JSAs below what they would receive if those benefits satisfied ERISA's actuarial equivalence requirements. The Plans also improperly reduce the QPSA that surviving spouses receive because those benefits are based on a QJSA that does not satisfy ERISA's actuarial equivalence requirements.

97.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

98.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating QJSAs, QOSAs, and QPSAs violate ERISA's actuarial equivalence requirements. By not providing an actuarially equivalent benefit, Defendants have violated Section 205 of ERISA, 29 U.S.C. § 1055 and the statute's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

99.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

        (a)     re-calculation and correction of benefits previously paid for QJSAs, QOSAs, and QPSAs under the Plans;

1    (b)    an "accounting" of all prior benefits and payments;

2    (c)    a surcharge

3    (d)    disgorgement of amounts wrongfully withheld;

4    (e)    disgorgement of profits earned on amounts wrongfully withheld;

5    (f)    a constructive trust;

6    (g)    an equitable lien;

7    (h)    an injunction against further violations; and

8    (i)    other relief the Court deems just and proper.

9                              **SECOND CLAIM FOR RELIEF**

10    **For Reformation of the Plans and Recovery of Benefits Under the Reformed Plans**

11                          **(ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1))**

12    78.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this

13    Complaint.

14    79.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary

15    to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title

16    or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such

17    violations or (ii) to enforce any provisions of this title or the terms of the plan."

18    80.    The Plans improperly reduce annuity benefits for participants who receive either

19    a QJSA, a QOSA, or a QPSA below the benefits that they would receive if those benefits satisfied

20    ERISA's actuarial equivalence requirements. By not providing actuarially equivalent benefits,

21    Defendants have violated Section 205 of ERISA, 29 U.S.C. § 1055.

22    81.    Plaintiff is entitled to reformation of the Plans to require them to provide

23    actuarially equivalent benefits.

24    82.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or

25    beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to

26    enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the

27    terms of the plan."

28

83.     Plaintiff is entitled to recover actuarially equivalent benefits, to enforce her rights to the payment of past and future actuarially equivalent benefits, and to clarify her rights to future actuarially equivalent benefits, under the Plans following reformation.

### THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

84.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

85.     As the Plans' Administrator, the Administrative Committee is a named fiduciary of the Plans.

86.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

87.     The Administrative Committee and its members are fiduciaries for the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans as well as authority and control over the disposition of Plans' assets. In particular, they had authority or control over the amount and payment of QJSAs, QOSAs, and QPSAs that were paid from Plan assets.

88.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plans are consistent with ERISA.

89.    The Plans are not consistent with ERISA because they calculate QJSA and QOSA benefits using unreasonable conversion factors that are likely based on antiquated actuarial assumptions resulting in benefits that do not satisfy ERISA's actuarial equivalence requirements, resulting in participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA. The Plans also improperly reduce the QPSAs that surviving spouses receive because those benefits do not satisfy ERISA's actuarial equivalence requirements.

90.    In following the Plans, which did not conform with ERISA, the Administrative Committee and its members exercised their fiduciary duties and control over the Plans' assets in breach of their fiduciary duties.

91.    ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Administrative Committee to pay benefits that were not actuarially equivalent, in violation of ERISA, Delta breached its fiduciary duties to supervise and monitor the Administrative Committee.

92.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

93.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plans' established methodologies for calculating actuarially equivalent QJSAs, QOSAs, and QPSAs violate ERISA.

94.    Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)    re-calculation, correction, and payments of Class Members' benefits;

(b)    an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards [A1] the following relief:

A.     Certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declaring that the Plans fail to properly calculate and pay benefits in violation of ERISA's actuarial equivalence requirements;

C.     Ordering Defendants to bring the Plans into compliance with ERISA, including, but not limited to, reforming the Plans to bring them into compliance with ERISA with respect to the calculation of actuarially equivalent benefits;

D.     Ordering Defendants to correct and recalculate benefits that have been paid;

E.     Ordering Defendants to provide an "accounting" of all prior payments of benefits under the Plans to determine the proper amounts that should have been paid;

F.     Ordering Defendants to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.     Ordering Defendants to disgorge any profits earned on amounts improperly withheld;

H.     Imposition of a constructive trust;

I.     Imposition of an equitable lien;

J.     Reformation of the Plans;

K.    Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements

L.    Ordering Defendants to pay future benefits in accordance with the terms of the Plans, as reformed.

M.    Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate equitable relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

N.    Awarding to Plaintiff's counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.    Any other relief the Court determines is just and proper.

DATED this  10th  day of December, 2021.

KEMP JONES, LLP

*/s/ Don Springmeyer*

Don Springmeyer, Esq. (SBN# 1021)
Michael J. Gayan, Esq. (SBN#11135)
Alysa M. Grimes, Esq. (SBN#15415)
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169

Robert A. Izard *(pro hac vice forthcoming)*
Douglas P. Needham *(pro hac vice forthcoming)*
Oren Faircloth *(pro hac vice forthcoming)*
IZARD KINDALL & RAABE
29 South Main Street, Suite 305
West Hartford, Connecticut 06107

Gregory Y. Porter *(pro hac vice forthcoming)*
Mark G. Boyko *(pro hac vice forthcoming)*
BAILEY & GLASSER LLP
1054 31st Street, NW, Suite 230
Washington, DC 20007
*Attorneys for Plaintiff, Marsha R. DuVaney and the putative class*

27